Phillip M. BLOOM, M.D., Plaintiff,

v.

HENNEPIN COUNTY, Hennepin County Board of Commissioners, Hennepin County Medical Center, a Minnesota non-profit corporation, Hennepin Faculty Associates, Regional Kidney Disease Program f/k/a Minneapolis Medical Research Foundation, Fred Shapiro, M.D., Morris Davidman, M.D., and Allan J. Collins, M.D., Defendants.

No. Civ. 4–89–615.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 22, 1992.

Frank R. Berman, Scott G. Harris, Minneapolis, Minn., for plaintiff.

Michael O. Freeman, Hennepin County Atty., and Janeen E. Rosas, Asst. County Atty., Minneapolis, Minn., for defendants Hennepin County, Hennepin County Bd. of Com'rs, and Hennepin County Medical Center.

John D. French, John E. Harris, John F. Beukema, Faegre & Benson, Minneapolis, Minn., for defendants Hennepin Faculty Associates, Regional Kidney Disease Program f/k/a Minneapolis Medical Research Foundation, Fred Shapiro, M.D., Morris Davidman, M.D., and Allan J. Collins, M.D.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motions for summary judgment. The motion of the Hennepin County defendants will be granted. The motion of the remaining defendants will be granted in part and denied in part.

FACTS

Plaintiff is a physician specializing in nephrology, a field of medicine involving the treatment of diseases and conditions of the kidney. Defendant Hennepin County Medical Center (HCMC) is a public hospital owned and operated by defendant Hennepin County; HCMC, Hennepin County, and the Hennepin County Board of Commissioners will be referred to in this memorandum as "the Hennepin County defendants." Defendant Hennepin Faculty Associates (HFA) is a nonprofit corporation formed in 1984 that has contracted with Hennepin County to provide all physician services at HCMC. Defendant Regional Kidney Disease Program (RKDP) operates outpatient kidney dialysis centers throughout Minnesota and adjoining states; RKDP was originally an unincorporated operating division of Minneapolis Medical Research Foundation (MMRF), a nonprofit corporation formed by physicians at HCMC to promote medical research. On May 17, 1989, MMRF (and therefore its component RKDP) became a wholly-owned subsidiary of HFA. Defendants Shapiro, Davidman, and Collins are nephrologists employed by HFA. Shapiro is president of HFA and Davidman is currently chief of the nephrology division at HFA and HCMC; when the events giving rise to this action occurred, Davidman was medical director of RKDP and Collins was director of dialysis operations for RKDP. Defendants HFA, RKDP, Shapiro, Davidman, and Collins will be referred to in this memorandum as "the HFA defendants."

The facts underlying plaintiff's claims, which will be briefly summarized here, are more fully set forth in the discussion of the separate claims. From 1977 to 1984, plaintiff was employed by the University of Minnesota as an assistant professor assigned to HCMC. In 1984, when the physicians of HCMC formed HFA, plaintiff became a member and employee of HFA. Plaintiff had full attending staff privileges

at HCMC both as an employee of HCMC and as an employee of HFA. Pl.'s Mem., Bloom Aff. ¶ 2. While technically a specialist in nephrology, plaintiff also had an interest in the treatment of multiple sclerosis, and developed a protocol[1] for using a technique called lymphocytapheresis to deplete a patient's lymphocytes to modify the patient's immunological responses. *Id.* ¶ 4–7. This treatment proved successful for several of plaintiff's multiple sclerosis patients. *Id.* ¶ 16.

In January 1989, plaintiff was informed that his employment with HFA would be terminated; on April 13, 1989 he received written confirmation of his termination. HFA Def.'s Mem., Bloom Dep. at 13–15; Pl.'s Mem., Bloom Aff., Ex. C. Because HFA had an exclusive contract to provide physician services for HCMC, HCMC took the position that plaintiff could no longer see patients at HCMC. When plaintiff attempted to schedule a lymphocytapheresis treatment for one of his multiple sclerosis patients on May 25, 1989, HFA informed him that he would not be permitted to treat any patients within HFA clinics or HCMC facilities that were under HFA control; plaintiff took this to mean that he would be denied access to all RKDP facilities. Pl.'s Mem., Bloom Aff., Ex. G. HFA also stated that the lymphocytapheresis treatments would continue under the supervision of an HFA doctor.

Plaintiff commenced this action, alleging state and federal antitrust violations, deprivation of due process, breach of contract, breach of fiduciary duty, conversion, misappropriation of trade secrets, fraud, conspiracy, and wrongful interference with business relationships. Defendants have moved for summary judgment on all claims.

## DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a

summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## I. *The Antitrust Claims*

Plaintiff alleges that HFA and RKDP have entered into a market allocation conspiracy to monopolize the End Stage Renal Disease (ESRD)[2] market in the Twin Cities in violation of state and federal antitrust laws. Plaintiff asserts that HFA and RKDP, together with three private ne-

---

1. A protocol is a written document setting forth a procedure for a given medical treatment. Pl.'s Mem., Bloom Aff. ¶ 11.

2. ESRD is treated with long term dialysis or transplantation; thus, plaintiff alleges that defendants have captured the market of dialysis and transplantation services.

phrology groups who are not parties to this action, have agreed to act as a single firm within the Twin Cities market. Acting as a single firm, plaintiff claims, these groups control the supply of ESRD treatment, permit demand to outstrip supply, and allocate patients among themselves according to geographical "turfs," thus monopolizing the market and creating barriers that prevent nephrologists outside the cartel from entering the market. Pl.'s Mem., Sloan Aff. ¶ 34. Plaintiff alleges that HCMC participated in this scheme by denying staff privileges to all doctors not employed by HFA and by participating in the market allocation plan. Pl.'s Mem. in Opp. to Henn.Cty. Def.'s Mot. for Summ.J. at 14; Pl.'s Mem. in Opp. to HFA Def.'s Mot. for Summ.J. on Antitrust Claims at 7.

In arguing for summary judgment, the Hennepin County defendants argue that they are immune from federal antitrust liability under the Local Government Antitrust Act, 15 U.S.C. § 34, *et seq.*, and the state action doctrine and that they are immune from state antitrust liability under the terms of the Minnesota Antitrust Act. The HFA defendants argue that, to the extent plaintiff alleges that the HFA/HCMC contract violated antitrust laws, they are immune from suit. The HFA defendants also argue that there is no evidence of a market allocation conspiracy or a monopoly and that, in any event, plaintiff has not suffered an antitrust injury.

**A. Are the Hennepin County Defendants Immune from Federal Antitrust Liability?**

The Local Government Antitrust Act provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 15 ... of this title [providing for private actions for antitrust violations] from any local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35(a). The definition of "local government" includes counties as well as any special function governmental unit established by state law. 15 U.S.C. § 34(1). Plaintiff does not dispute that HCMC is a special function governmental unit established under Minn.

Stat. § 383B.217 or that HCMC acted within its official capacity in its dealings with plaintiff. Therefore, the Local Government Antitrust Act immunizes the Hennepin County defendants from private suits seeking damages under 15 U.S.C. § 15.

As plaintiff notes, the Local Government Antitrust Act does not immunize the Hennepin County defendants from suits seeking injunctive relief under 15 U.S.C. § 26. 15 U.S.C. § 35; *Sandcrest Outpatient Services v. Cumberland County Hospital*, 853 F.2d 1139, 1142 (4th Cir. 1988). However, the Hennepin County defendants may be immune from plaintiff's claim for injunctive relief under the state action doctrine. The state action doctrine derives from *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), in which the United States Supreme Court held that the Sherman Act did not apply to the anticompetitive conduct of a state acting through its legislature. While state action immunity does not automatically devolve to municipalities, a municipality may be immune from federal antitrust liability if its anticompetitive activities were authorized by the state "pursuant to state policy to displace competition with regulation or monopoly public service." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) (quoting *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978)); *see also City of Columbia v. Omni Outdoor Advertising, Inc.*, —— U.S. ——, 111 S.Ct. 1344, 1349, 113 L.Ed.2d 382 (1991) (*Parker* immunity attaches where a municipality's restriction of competition is an authorized implementation of state policy).

The Supreme Court has articulated a two-part test to determine whether a party may claim immunity from antitrust suits under the state action doctrine. First, the challenged activity must be clearly articulated and affirmatively expressed as state policy. *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1979); *see also Town of Hallie*, 105 S.Ct. at 1718. A state policy to displace competi-

tion can be inferred if the challenged restraint is a necessary and reasonable consequence of engaging in an authorized activity. *Paragould Cablevision, Inc. v. City of Paragould,* 930 F.2d 1310, 1313 (8th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 430, 116 L.Ed.2d 450 (1991). Second, the activity must be actively supervised by the state. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. The purpose of the second prong is to assure that the activity was indeed undertaken in accordance with state policy. Where the allegedly anticompetitive conduct is undertaken by the municipality itself, rather than by a private party, and state authorization is established under the first prong of the test, it is presumed that the municipality acted in accordance with state policy and active state supervision need not be established. *Town of Hallie,* 105 S.Ct. at 1720.

The Hennepin County defendants assert that under these standards, they are immune from plaintiff's federal antitrust claims. The Hennepin County defendants rely largely on Minn.Stat. § 383B.211, which allows the Hennepin County Board of Commissioners to establish a department "for the purpose of providing comprehensive health care and related services as required by law and as determined by the board to be in the best interest of the county." The Hennepin County defendants argue that because the number of services to be provided under this statute is large, the board's powers are broad and could be expected to replace competition with regulation in order to provide medical services to all county residents. The legislature's intent to replace competition with regulation is underscored, the Hennepin County defendants argue, by Minn.Stat. § 383B.145(4), which provides that contracts for professional, medically related services authorized by the Hennepin County Hospital Act are not governed by Minnesota's competitive bidding statute.

Plaintiff disputes that the statutory scheme creating HCMC contemplates re-

placing competition with regulation. Plaintiff notes that Minn.Stat. § 383B.211 only enables the Hennepin County board of commissioners to provide medical services; it does not enable the board to regulate them. Similarly, plaintiff continues, Minn.Stat. § 383B.217(1) provides only that "Hennepin county may *establish* a medical center to provide hospital and medical services to the general public." (Emphasis added.)

Plaintiff then points to provisions of Minn.Stat. § 383B.217 that he claims specifically contemplate that the medical center will compete with other health care providers, not displace them. Subdivision 1 provides that if the board determines that health care services are better provided by other hospitals, it may pay the reasonable costs of those services rather than provide them itself and may even disband the center entirely in favor of providing medical services through some other means. Subdivision 7(b) provides that, notwithstanding Minnesota's open meeting law, the board "may meet in closed session to discuss and take action on specific products or services that are in direct competition with other providers ... in the public or private sector, if disclosure of information pertaining to those matters would clearly harm the competitive position of the medical center." Finally, subdivision 7(d) provides that "[d]ata concerning specific products or services that are in direct competition with other providers of goods or services in the public or private sector are trade secret information ... to the extent disclosure of information pertaining to the matters would clearly harm the competitive position of the medical center." Plaintiff argues that these provisions in HCMC's enabling statute establish the legislature's intent that the center act not as a regulator, but as a commercial participant in the hospital market.[3]

Plaintiff asserts that the Hennepin County defendants engaged in two types of anticompetitive activity: first, they limited

---

**3.** Plaintiff's argument that the hospital is a market participant, not a regulator, is based on dicta in *City of Columbia, supra,* suggesting a possible market participant exception to the state action doctrine. The Eighth Circuit, however, has explicitly rejected such an exception as a mere suggestion, not a rule of law. *Paragould Cablevision, Inc.,* 930 F.2d at 1313.

HCMC staff privileges to HFA physicians and second, they participated in the market allocation scheme. The first activity, limiting HCMC staff privileges to HFA physicians, is authorized by clearly expressed state policy. Minn.Stat. § 383B.217 specifically authorizes Hennepin County to provide health care services in the way the board deems most appropriate, to establish rules and regulations for the management of the medical center, and to contract with private organizations to provide medical services. Thus, the legislature clearly contemplated that HCMC would engage in the very activity that plaintiff challenges: determine who will practice at HCMC by contracting with private organizations to provide medical services.[4] Indeed, as the Hennepin County defendants note, the legislature even facilitated HCMC's ability to contract for medical services by exempting such contracts from competitive bidding requirements. See Minn.Stat. § 383B.145(4). Any restraint on trade flowing from contracts entered into by HCMC is a necessary and reasonable consequence of the exercise of its statutory authority to contract for services, thus giving rise to an inference that state policy favors such displacement of competition. Therefore, the Court concludes that any anticompetitive effects of HCMC's contract with HFA or of its rule limiting staff privileges to HFA physicians are shielded from antitrust attack under the state action doctrine.

■ The Hennepin County defendants would not, however, be immune from liability for participating in the alleged market allocation scheme. The Court agrees with plaintiff that the statutes creating HCMC contemplate that the medical center will compete with other health care providers, not displace them. Moreover, the mere fact that the legislature granted the county board authority to act does not necessarily confer on the board the authority to preclude others from acting. *Lancaster Community Hospital v. Antelope Hospital*

*District*, 940 F.2d 397, 401 (9th Cir.1991). However, while plaintiff asserts that the Hennepin County defendants participated in the market allocation scheme, he has not come forth with evidence sufficient to support that assertion. Plaintiff states that "the record unequivocally demonstrates that HCMC in no way sought to, or did, regulate, supervise, direct, encourage, or make decisions respecting the anticompetitive acts of HFA Defendants." Pl.'s Mem. in Opp. to HFA Def.'s Mot. for Summ.J. on Antitrust Claims at 14. As the Hennepin County defendants point out, plaintiff also admits that HCMC left provision of medical services entirely to HFA's discretion and that the ESRD services allocated under the scheme were unrelated to the HFA/HCMC contract. *Id.* at 2. Finally, plaintiff states that HFA employees, not the Hennepin County defendants, were responsible for pricing dialysis services. *Id.* at 5.

Plaintiff's market allocation claim against HCMC appears to be only that HCMC knew about and acquiesced in the scheme. Plaintiff provides no authority for the proposition that mere knowledge of an illegal scheme leads to antitrust liability. In any event, he has failed to point to evidence that HCMC actually did know about the scheme. Plaintiff states that the HCMC medical director knew of the plan to allow only certain private nephrologists to follow transplant patients at HCMC, that he knew RKDP intended to create new dialysis units, and that he knew the plan was intended to locate the units where the nephrologists practiced. Pl.'s Mem. in Opp. to HFA Def.'s Mot. for Summ.J. on Antitrust Claims at 7–8. In fact, however, the medical director testified that he knew community nephrologists were permitted to follow patients at HCMC, not that only certain nephrologists had this privilege. Pl.'s Mem., Raile Dep. at 91–92. Moreover, the medical director specifically stated that he did not know whether the location of the new dialysis units were linked to where the

---

**4.** Plaintiff does not argue that the Hennepin County defendants lacked authority to enter into an *exclusive* contract with HFA. Such an argument would in any event be unavailing; the Eighth Circuit has held that exclusive contracts are permissible under statutes authorizing governmental units to contract for services, even if the statutes do not explicitly provide for exclusive contracts. *L & H Sanitation v. Lake City Sanitation,* 769 F.2d 517, 522 (8th Cir.1985).

private nephrologists practiced. *Id.* at 93. Finally, while the medical director was present at a board meeting in which an HFA physician presented a plan to open suburban dialysis units, he testified that he did not even recall the discussion. *Id.* at 102–03. Thus, it appears that HCMC, through its medical director, knew only that RKDP intended to compete in the dialysis market by opening new centers; plaintiff has pointed to no evidence that HCMC knew of an illegal scheme to allocate the ESRD market.

In summary, the Court concludes that because the contract between HFA and HCMC was specifically authorized by statute, the Hennepin County defendants are immune from liability for any anticompetitive effects resulting from the contract. While HCMC did not have statutory authorization to participate in a market allocation scheme, plaintiff has not proffered evidence indicating that HCMC did participate in that scheme. Therefore, the Hennepin County defendants are entitled to summary judgment on the federal antitrust claims.

### B. Are the Hennepin County Defendants Immune from State Antitrust Liability?

■ The Minnesota Antitrust Act provides that "[n]othing contained [in this act] shall apply to actions or arrangements otherwise permitted, or regulated by any regulatory body or officer acting under statutory authority of this state." Minn.Stat. § 325D.55(2). The Minnesota Supreme Court has held that this exemption from antitrust liability applies only to activities that are required or specifically permitted by the government. *Minnesota–Iowa Television v. Watonwan Television Improve-*

*ment Ass'n,* 294 N.W.2d 297, 306 (Minn. 1980).

■ The Hennepin County defendants argue that because their actions were specifically authorized by state statute, they are immune from state antitrust liability under section 325D.55(2). As noted above, the Hennepin County defendants' actions in limiting staff privileges to HFA physicians were authorized by statute. Therefore, the Hennepin County defendants are immune from state antitrust liability for those actions. While the Hennepin County defendants are not immune for any role they played in the market allocation scheme, plaintiff has not produced evidence showing that the Hennepin County defendants were involved in the scheme. Therefore, the Hennepin County defendants are entitled to summary judgment on the state antitrust claims.

### C. Does Hennepin County's Immunity Shield HFA from Antitrust Liability?

■ The HFA defendants argue that, to the extent plaintiff's antitrust claims arise from the exclusionary effect of the contract between HFA and HCMC, they are barred by the state action doctrine.[5] The Court has concluded that the Hennepin County defendants are immune from antitrust liability alleged to arise from the HFA/HCMC contract. Thus, the issue here is whether that immunity extends to the HFA defendants.

As noted above, a private defendant seeking to invoke state action immunity must establish not only that the challenged activity was authorized by state statute, but also that the activity was actively supervised by the state. However, several circuits have held that once a municipality

---

**5.** The HFA defendants also argue that antitrust claims rising from the contract are barred by the Local Government Antitrust Act and by Minn.Stat. § 325D.55. Section 36(a) of the Local Government Antitrust Act immunizes private parties from antitrust liability "based on any official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a). This section applies principles of state action immunity to the conduct of local governmental authorities in directing the actions of nongovernmental

parties. *Sandcrest Outpatient Services v. Cumberland County Hospital System, Inc.,* 853 F.2d 1139, 1143 (4th Cir.1988) (citations omitted). Thus, if the HFA defendants are immune under the state action doctrine, they are also immune under the Local Government Antitrust Act.

Minn.Stat. § 325D.55(2) bars antitrust claims based on activities required or permitted by the government. As discussed above, the contract was specifically permitted by the government, and claims based on it are barred under section 325D.55(2).

is found to be immune from antitrust liability, the immunity for that conduct should also be extended to private parties. *City Communications, Inc. v. City of Detroit,* 660 F.Supp. 932, 934–35 (E.D.Mich.1987), *aff'd.,* 888 F.2d 1081 (6th Cir.1989); *Cine 42nd Street Theater Corp. v. Nederlander Organization,* 790 F.2d 1032, 1048 (2d Cir. 1986); *Charley's Taxi Radio Dispatch v. Sida of Hawaii,* 810 F.2d 869, 878 (9th Cir.1987). Recognizing that the state action doctrine protects state action, not state actors, these courts reason that to allow suits against private parties for actions immunized as to municipalities would allow plaintiffs to circumvent the state action doctrine and challenge protected municipal decisions through artful pleading.

The United States Court of Appeals for the Eighth Circuit has not explicitly addressed the question of whether a municipality's immunity extends to private parties. However, the Eighth Circuit has held that where a municipality grants a contract under statutory authority, the state action doctrine precludes an unsuccessful bidder from pursuing antitrust claims against the successful bidder. *L & H Sanitation v. Lake City Sanitation,* 769 F.2d 517 (8th Cir.1985). In reaching this result, the Eighth Circuit acknowledged that private parties invoking the state action doctrine were generally required to establish active state supervision. *Id.* at 520. However, having concluded that the municipality was statutorily authorized to award the contract at issue, the court did not impose the active supervision requirement, instead concluding that the award of the contract itself was immune from attack. *Id.* at 522.

In the instant case, as in *L & H Sanitation,* HCMC was statutorily authorized to award the contract for medical services to HFA and is immune from antitrust attack for that action. Under *L & H Sanitation,* then, the HCMC's immunity extends to

HFA, the party to whom the contract was awarded. A contrary holding would allow plaintiff to defeat the state action doctrine and attack a protected decision.

Plaintiff makes a protracted argument that the HFA defendants cannot benefit from the Hennepin County defendants' immunity absent a showing that the Hennepin County defendants, and not the HFA defendants, made the "effective decision" that injured plaintiff. Plaintiff argues that because HCMC did not direct or supervise the anticompetitive acts of which plaintiff complains, the HFA defendants made the decisions that injured plaintiff. To the extent that plaintiff complains of the alleged market allocation scheme, this argument may have some merit. However, to the extent that the anticompetitive activity complained of is HCMC's limitation of staff privileges to HFA physicians, HCMC clearly made the decisions that injured plaintiff, by awarding HFA the exclusive contract under which only HFA physicians could have staff privileges at HCMC.

Because HCMC was statutorily authorized to award the exclusive contract to HFA, the contract itself is immune from attack under the state doctrine action. Therefore, the Court will grant summary judgment for the HFA defendants on the issue of whether plaintiff can assert antitrust claims against them based on the HCMC/HFA contract.[6]

**D. Has Plaintiff Produced Sufficient Evidence of a Market Allocation Conspiracy?**

Plaintiff asserts that the HFA defendants have entered into a conspiracy with three private nephrology groups to allocate the ESRD market in the Twin Cities in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[7] In order to survive the HFA defendants' motion for sum-

---

**6.** The HFA defendants also argue that, in any event, the HCMC/HFA contract does not unreasonably restrain trade, because it prevents non-HFA nephrologists from practicing at only one hospital out of twenty in the metropolitan area, having less than six percent of the acute-care inpatient beds. HFA Def.'s Mem., Lynk Aff. ¶ 43(a). Plaintiff does not refute these statistics.

However, because the HCMC/HFA contract is immune from antitrust attack, the Court need not address the issue.

**7.** Plaintiff apparently relies on the same factual allegations and arguments to support his state antitrust claim.

mary judgment on this issue, plaintiff must establish that there is a genuine issue of material fact as to whether the HFA defendants entered into an illegal conspiracy. *Matushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, "[c]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. at 1356. Thus, plaintiff must present evidence "'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)).

In support of his claim of market allocation conspiracy, plaintiff relies largely on three pieces of evidence. First, he claims that RKDP's transplant and dialysis facilities are shared by nephrologists of HFA and the three groups, and are closed to nephrologists who are not affiliated with those entities. Second, he cites testimony that, because RKDP's St. Paul and Minneapolis dialysis facilities are full, some residents of those cities had to go to the Arden Hills and Edina units for dialysis. Pl.'s Mem., Sloan Aff. ¶ 5. Finally, he relies on the testimony of defendant Davidman, who stated that nephrologists "have certain, what they call, turf areas.... Turf areas are areas that nephrologists seem to be prominent in. And the other nephrologists say, I think, well, that is their turf, let's not go after it." Pl.'s Mem., Davidman Dep. at 298–99. Davidman went on to state that in assigning medical directors to head RKDP's suburban clinics, RKDP selected the private nephrologists who had the most patients in the area of the clinic, that is, the nephrologist in whose "turf" the clinic was located. *Id.* at 300. Plaintiff asserts that the nephrologists of HFA and the three private groups respect these turfs, and that they therefore do not compete with each other for patients. Thus, plaintiff concludes, HFA and the three groups act as a

single firm within the market, allocate patients among themselves, and preclude nephrologists who are not affiliated with HFA or the three groups from offering ESRD services in the Twin Cities.

The HFA defendants dispute the existence of a market conspiracy on several grounds. First, they assert that RKDP transplant and dialysis facilities are open to patients of all nephrologists, subject only to the availability of space at the more crowded units. HFA Def.'s Mem., Davidman Aff. ¶ 6. To back up this assertion, the HFA defendants submit affidavits of doctors not affiliated with HFA or the three groups who have used RKDP facilities. *See* HFA Def.'s Mem., Rubin Aff., Olson Aff., Ehler Aff., Duncan Aff.

Second, the HFA defendants deny that any agreement exists to divide the Twin Cities market into turfs. The HFA defendants point out that defendant Davidman's testimony about turfs merely reflects his speculation that nephrologists did not go after other nephrologists' turf, and that Davidman specifically stated that nephrologists from one of the three groups "basically go everywhere." Pl.'s Mem., Davidman Dep. at 299. Davidman did not testify that these turfs exist by agreement, and in his affidavit states that he knows of no such agreement. HFA Def.'s Mem., Davidman Aff. ¶ 3–4. The HFA defendants also present testimony of the three groups that their decisions to concentrate their practices in certain geographic locations resulted from their independent decisions, not from any agreement with other nephrologists. HFA Def.'s Mem., Breitenbucher Aff. ¶ 4, Sweet Aff. ¶ 4, Husebye Aff. ¶ 4.

Third, the HFA defendants assert that the evidence reveals that no geographical turfs actually exist. The HFA defendants point out that, contrary to the assertion of plaintiff's expert that HFA does not practice in the suburbs,[8] HFA has patients in RKDP's suburban dialysis units. HFA Def.'s Mem., Lynk Aff. Tables 7, 8. Moreover, all three of the private groups have

---

**8.** Plaintiff's expert bases this assertion on testimony of defendant Davidman. Davidman stated, however, that HFA did not practice in St.

Paul or Edina; he did not state that HFA did not practice in the suburbs. Pl.'s Mem., Sloan Aff. ¶ 8, Davidman Dep. at 257.

competing offices in St. Paul, and two of the groups have competing offices in Edina, Minneapolis, and St. Louis Park. HFA Def.'s Mem., Breitenbucher Aff. ¶ 3, Husebye Aff. ¶ 3, Sweet Aff. ¶ 4.

Fourth, the HFA defendants assert that in order to show a market allocation scheme implemented through RKDP dialysis units, the scheme would have to both assign all patients in a given geographic area to a particular unit and allow only one of the conspiring groups access to that unit. Unless both of these allocations were made, ESRD patients would have access to alternative competing nephrologists, and the market allocation scheme would fail. HFA Def.'s Mem., Lynk Aff. ¶ 26. The HFA defendants then point to their expert's analysis of the patient and physician mix at each RKDP facility, which indicates that all patients in a given geographic area do *not* receive dialysis at the same unit and that no dialysis unit is patronized solely by a single practice group. *Id.* ¶ 29–39.

Finally, the HFA defendants assert that no anticompetitive inference arises from the fact that doctors from the three groups have been appointed medical directors of various RKDP dialysis units. The HFA defendants proffer evidence that the director's function is to supervise the non-physician staff and insure compliance with Medicare regulations. HFA Def.'s Mem., Davidman Dep. at 257–58. While the HFA defendants do not dispute that directors make policy decisions about patient care and establish protocols for medical procedures (Pl.'s Mem., McCormick Dep. at 14–15, Davidman Dep. at 7, 258), they assert that directors do not decide what patients are admitted to the units or make medical decisions for any patients in the unit other than their own. HFA Def.'s Mem., Breitenbucher Aff. ¶ 8–9, Husebye Aff. ¶ 8–9, Collins Dep. at 52–58, 62–63, 142. Moreover, the HFA defendants argue that there are substantial reasons for RKDP's decision to appoint doctors from the three

groups as medical directors that are inconsistent with an inference of anticompetitive intent: the non-HFA nephrologists wanted to participate in decisions affecting the units where their patients were treated, and RKDP thus decided to appoint as directors doctors who had significant numbers of patients at the units and could therefore be expected to take their jobs seriously. HFA Def.'s Mem., Davidman Dep. at 262–63, Collins Dep. at 171.

Plaintiff's primary defense of his market allocation theory is that the HFA defendants have failed to recognize that HFA and the three groups operate as a single firm, and that their analysis of the market is therefore flawed.[9] However, the HFA defendants point to evidence of vigorous competition between HFA and the three groups that refutes plaintiff's assertion that those entities function as a single firm within the Twin Cities market. While plaintiff's expert asserts that HFA limits its market to public assistance and Group Health patients, leaving to the three groups private patients (Pl.'s Mem., Sloan Aff. ¶ 3), the HFA defendants proffer evidence that HFA has patients that are neither on public assistance nor insured by Group Health (HFA Def.'s Mem., Shapiro Dep. at 53), and that one of the three groups is currently competing with HFA for the Group Health contract (HFA Def.'s Mem., Breitenbucher Aff. ¶ 11). The HFA defendants also point to evidence that one of the groups has supplanted RKDP as the provider of in-patient dialysis services at three hospitals whom RKDP previously served and that another of the groups has done the same at a fourth hospital. HFA Def.'s Mem., Sweet Aff. ¶ 10, Breitenbucher Aff. ¶ 11.

Moreover, none of the three groups relies on RKDP exclusively for dialysis services. HFA Def.'s Mem., Breitenbucher Aff. ¶ 5, Husebye Aff. ¶ 6, Sweet Aff. ¶ 5. One of the three groups has been particularly aggressive in seeking out other dialy-

---

**9.** There are two critical differences between the view of plaintiff's expert and that of the HFA defendants' expert. First, plaintiff's expert analyzes the market as if HFA and the three groups were a single firm. This difference affects

plaintiff's market allocation theory. Second, plaintiff's expert slices up the relevant product market differently than defendants' expert does. This difference affects plaintiff's monopoly theory.

sis facilities; in addition to opening its own dialysis unit in Golden Valley, it was instrumental in establishing a unit at Abbott–Northwestern Hospital. HFA Def.'s Mem., Sweet Aff. ¶ 5, 10. In its first year of operation, the Abbott–Northwestern unit diverted seventy patients from RKDP, causing RKDP a loss of more than three-quarters of a million dollars. HFA Def.'s Reply, Davidman Dep. at 252, Collins Dep. at 153. Finally, defendants note that the three groups have no control over where RKDP opens dialysis facilities; RKDP opened a unit in Burnsville despite one group's opposition (HFA Def.'s Mem., Breitenbucher Aff. ¶ 10), and refused that group's request to open a unit in Edina until the group threatened to find a vendor who would better serve it and its patients (HFA Def.'s Reply, Davidman Dep. at 468–70).

Based on this evidence, the Court concludes that plaintiff has failed to meet his burden of establishing that there is a genuine issue of material fact that the HFA defendants have entered into a conspiracy to allocate the ESRD market. There does appear to be a factual dispute regarding whether the RKDP dialysis facilities are open to all nephrologists: while the HFA defendants have proffered testimony that the facilities are open, plaintiff has presented evidence, in the form of a letter barring him from HFA-controlled facilities, that he has been excluded. Defendant Davidman asserts that that letter was intended to exclude plaintiff from HCMC and HFA facilities only, that the RKDP dialysis units and transplant clinic are not HCMC or HFA facilities, and that plaintiff has not, in the two-and-one-half years since the letter was written, asked him to clarify the meaning of his letter. Plaintiff does not respond to this assertion. In any event, however,

this factual dispute does not preclude summary judgment, for several reasons.

First, defendants have submitted evidence that at least some nephrologists that are not affiliated with HFA or the three groups have access to RKDP facilities; thus, plaintiff's exclusion does not, by itself, support the existence of a conspiracy to allocate the ESRD market between HFA and the three groups. Second, although plaintiff's market allocation theory is based on the assertion that HFA and the three firms operate as a single firm, plaintiff has not pointed to evidence to support this assertion. The HFA defendants, on the other hand, point to substantial evidence that HFA and the three groups do not act as a single firm, but compete vigorously amongst themselves.

Finally, the evidence plaintiff offers to support his market allocation theory—the testimony of one HFA physician that nephrologists had certain "turfs," the fact that dialysis patients were put in units farther from their homes when nearer units were full, and the fact that non-HFA directors were appointed as medical directors for the RKDP clinics—is insufficient to give rise to an inference that a market allocation conspiracy exists. Aside from defendant Davidman's speculation that Twin Cities nephrologists had carved out turfs that other nephrologists respected, there is no evidence that the "turfs" exist. Plaintiff, through his expert, disputes the validity of the defendants' studies showing that the patients at RKDP facilities are not allocated according to geography; however, he submits no analysis of his own to show that the patients are so allocated.[10] Nor does plaintiff submit any statistical evidence suggesting that physicians from HFA and the three groups limit their practices to geographical turfs. Indeed, defendants have shown that none of the entities

---

**10.** To the extent that plaintiff does provide statistical evidence for his claim, he bases those statistics on factual premises not supported by the evidence. He calculates the percentage of suburban RKDP patients attributable to the three groups only after eliminating HFA's patients, whom plaintiff asserts are public assistance and Group Health patients for whom the three groups do not compete. Pl.'s Mem., Sloan

Aff. ¶ 4, 27. As noted above, however, the HFA defendants have pointed to evidence that HFA's patients are not limited to public assistance and Group Health patients, and that the other groups do compete for Group Health patients. Therefore, the omission of HFA patients from the statistical analysis of patients at the suburban RKDP centers is not warranted.

charged with the conspiracy have turfs that are exclusively theirs. Moreover, even if patients and physicians using certain RKDP facilities were geographically clustered, that would not, standing alone, support an inference of antitrust conspiracy under *Matushita,* because such geographic clustering would be consistent with permissible competition: as the HFA defendants note, doctors may choose to limit their practices geographically for their own convenience, and patients may choose physicians and dialysis centers near their homes for the same reason.

Plaintiff's other two instances of allegedly anticompetitive conduct are similarly consistent with permissible competition. The fact that RKDP put patients from St. Paul and Minneapolis in suburban dialysis units is as consistent with permissible competition resulting in overcrowded city facilities as it is with an impermissible scheme to allocate patients to suburban turfs. The fact that RKDP appointed nephrologists from the three groups to be medical directors is as consistent with a permissible determination that doctors with more patients at a facility are better suited as directors as it is with an impermissible scheme to limit physician services on a geographical basis. Because plaintiff has not raised a genuine issue of fact as to whether the HFA defendants have entered into an illegal conspiracy, much less met his burden of presenting evidence tending to exclude the possibility that HFA and the three groups have acted independently, the Court will grant summary judgment for the HFA defendants on this issue.

### E. Has Plaintiff Produced Sufficient Evidence of a Monopoly?

 Plaintiff also claims that the HFA defendants and the three private nephrology groups have monopolized or attempted to monopolize the Twin Cities ESRD market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.[11] To prevail on a monopoly claim, a plaintiff must establish that the defendant possesses a monopoly power in a relevant market and that the defendant willfully acquired or maintains that power. *Midwest Radio Co. v. Forum Publishing Co.,* 942 F.2d 1294, 1297 (8th Cir. 1991) (citations omitted). To prevail on an attempted monopoly claim, a plaintiff must establish specific intent to control prices or destroy competition, anticompetitive conduct directed to accomplish the unlawful purpose, and a dangerous probability that the purpose will be achieved. *Id.*

Plaintiff's monopoly claim appears to be inextricably linked to his market allocation claim; he does not argue them separately, but claims that "HFA and RKDP have conspired with the three independent nephrology groups 'to act as one firm so as to assure their monopoly power, which is predicated on their control over the number of nephrologists in the ESRD market providing [ESRD] services.'" Pl.'s Mem. in Opp. to HFA Def.'s Mot. for Summ. J. on Antitrust Claims at 19 (quoting Sloan Aff. ¶ 34). Plaintiff defines the relevant product market as the market for ESRD services—that is, the market for long-term dialysis and kidney transplants. Pl.'s Mem., Sloan Aff. ¶ 11. Plaintiff defines the relevant geographical market as the Twin Cities metropolitan area. He then bases his claim of monopoly on the fact that "the dialysis supplied by RKDP is equal to approximately 65% of the market, and ... HFA and the Three Groups comprise well over 90% of the physicians in the market." *Id.* ¶ 12.

While the HFA defendants agree that the relevant geographical market is the Twin Cities metropolitan area, they define the relevant product market differently. The HFA defendants argue that plaintiff's analysis conflates three distinct markets: the nephrology market, within which doctors offer their services to kidney patients; the dialysis market, in which operators of dialysis centers offer their services to ESRD kidney patients; and the kidney transplant market, in which renal surgeons and hospitals offer their services to ESRD

---

**11.** Again, plaintiff appears to rely on the same factual allegations and argument to support his state antitrust claim.

kidney patients. HFA Def.'s Mem., Lynk Aff. ¶ 8. Defendants argue that as a nephrologist, plaintiff competes with HFA in the first market; plaintiff does not compete with RKDP, which operates in the second and third markets. Defendants then point out that HFA physicians constitute eighteen percent of the nephrologists in the Twin Cities area, and serve only twenty percent of the dialysis patients in the area. *Id.* ¶ 10–17; HFA Def.'s Reply, Sloan Supp. Aff. ¶ 10. As a matter of law, defendants argue, these figures are too low to support the existence of monopoly power (necessary for plaintiff's monopoly claim) or the dangerous probability that the HFA defendants will destroy competition (necessary for plaintiff's attempted monopoly claim). *See Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 974 (8th Cir.1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969) (twenty percent insufficient for actual monopolization); *United States v. Empire Gas Co.,* 537 F.2d 296, 305 (8th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (forty-seven to fifty percent insufficient to show dangerous probability of success).

The Court concludes that plaintiff has failed to adduce evidence sufficient to support his monopolization claims. Absent evidence that HFA and the three groups act as a single firm, plaintiff's assertion that they comprise ninety percent of the physicians in the market cannot support his claim. Rather, in order to establish a monopoly, plaintiff would have to show that *HFA physicians* hold monopoly power; this he has not done.

Moreover, the Court agrees with the defendants that in relying on RKDP's sixty-five percent market share to support his monopoly claim, plaintiff has improperly conflated two distinct markets. Whether products are in the same market for antitrust purposes depends upon the extent to which one can be substituted for another; if buyers consider products to be substitutes for each other, that is, if the products are reasonably interchangeable, they can be considered to be within the same product market. *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1537–38 (8th Cir.1989). As the HFA defendants note, however, the products of HFA and RKDP cannot be substituted for one another. RKDP provides dialysis services only; it employs no nephrologists and provides no physician services. A consumer seeking a nephrologist could not turn to RKDP to meet that need. HFA, on the other hand, provides physician services, including nephrology services. A consumer seeking dialysis services could not find them at HFA. Because plaintiff provides physician services, not dialysis services, he competes in a different product market than RKDP, and cannot rely on RKDP's market share to show a monopoly in the nephrology market.

Although the composition of the relevant product market is a factual question, summary judgment on the issue is appropriate if there is no material question of fact regarding the market composition. *Midwest Radio Co.,* 942 F.2d at 1297. Because plaintiff has not presented evidence establishing that HFA and the three groups act as a single firm or that he competes with RKDP in providing dialysis services, plaintiff's figures do not support an inference that a monopoly exists or is a dangerous probability. Therefore, the Court will grant the HFA defendants summary judgment on plaintiff's monopoly claims.

### F. Has Plaintiff Suffered an Antitrust Injury?

 Finally, the HFA defendants contend that, regardless of the merits of plaintiff's antitrust claims, he cannot recover because he has suffered no antitrust injury. The HFA defendants note that the antitrust laws were enacted to protect competition, not competitors. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333 (1990) (citations omitted). Antitrust injury is therefore an essential element of an antitrust claim. *Midwest Radio Co.,* 942 F.2d at 1297. When plaintiff was fired, HFA recruited a nephrologist from Stanford University to replace him. HFA Def.'s Mem., Lynk Aff. ¶ 41. Thus, even if plaintiff's firing resulted in his exclusion from the

Twin Cities nephrology market, the HFA defendants argue that there would be no injury to competition, because the number of nephrologists practicing in the Twin Cities was the same before and after plaintiff's termination. The HFA defendants maintain that because there is no connection between plaintiff's injury—the loss of his job—and injury to competition, his antitrust claims must fail. In response, plaintiff argues that he has indeed shown antitrust injury, because the HFA defendants' conduct has created barriers that preclude nephrologists who are not affiliated with HFA or the three groups from entering the Twin Cities market.[12]

To refute plaintiff's claim of barriers to market entry, the HFA defendants point to evidence that the number of nephrologists practicing in the Twin Cities increased by sixty-nine percent between 1982 and 1990. Plaintiff's assertion that all new entrants are affiliated with HFA or one of the three groups does not negate the significance of this figure, absent evidence that HFA and the three groups operated as a single firm. Moreover, defendants have proffered testimony of numerous nephrologists practicing in the Twin Cities who are affiliated with neither HFA nor the three groups and who make minimal use of RKDP's facilities; these nephrologists in turn testify that other nephrologists have joined their practices throughout the 1980s. *See, e.g.,* HFA Def.'s Mem., Ehlers Aff., Olson Aff., Rubin Aff., Duncan Aff. The Court concludes that, in the face of this evidence, plaintiff's assertion of barriers to market entry is unsupported. Therefore, the Court agrees with the HFA defendants that, even if plaintiff had set forth facts reflecting the existence of a monopoly, his claim would fail for lack of antitrust injury.

## II. *The Contract Claims*

Plaintiff has brought breach of contract claims against both the HFA defendants

and the Hennepin County defendants. He alleges that the Hennepin County defendants breached his contract by terminating his staff privileges without a hearing, and that the HFA defendants breached his contract by interfering with his treatment of multiple sclerosis patients and by immediately relieving him of patient care duties upon his termination.

### A. The Hennepin County Contract

██ Article 8 of the HCMC bylaws allows the Hennepin County Board of Commissioners (the board) to take corrective action against a practitioner who engages in conduct that is detrimental to patient safety or the delivery of medical care or that is disruptive to HCMC operations. Pl.'s Mem., Bloom Aff., Ex. H § 8.1–1. Section 8.1–7 of the bylaws provides that when the board takes an action that "is adverse as defined in Section 9.2–3, the Chief Executive Officer shall promptly so inform the practitioner by special notice, and he/she shall be entitled to the procedural rights as provided in Article 9." Section 9.2–3 provides:

> The following recommendations or actions shall entitle the practitioner affected thereby to a hearing upon his/her written request within 15 days after receiving notice of the adverse recommendation or adverse Board decision:
>
> . . . . .
>
> (4) Revocation of staff membership . . .
>
> . . . . .
>
> (12) Revocation of clinical privileges. . . .

It is undisputed that after HFA terminated plaintiff, he requested, but did not receive, a hearing from HCMC regarding his staff privileges.

---

**12.** In addition, plaintiff correctly notes that an agreement to allocate a market is presumed to be an unreasonable and illegal restraint on trade without inquiry into the harm it actually caused. *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Copperweld Corp. v. Independence Tube*

*Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). However, plaintiff has not established that any agreement to allocate the market existed, and would be required to show antitrust injury in order to prevail on a monopoly theory. *Midwest Radio Co.,* 942 F.2d at 1297.

The Hennepin County defendants argue that Article 9 provides for a hearing only if the board takes corrective action under Article 8. They argue that plaintiff lost his staff privileges because HFA terminated his employment contract and because under HCMC's exclusive provider contract with HFA, only HFA physicians were allowed to attend patients at HCMC. Because HFA, and not the board, took the action that resulted in plaintiff's loss of privileges, the Hennepin County defendants maintain that plaintiff was not entitled to a hearing under the bylaws.

In response, plaintiff asserts that the bylaw provisions entitle practitioners to a hearing "when an adverse action occurs." Pl.'s Mem. in Opp. to Henn. Cty. Def.'s Mot. for Summ. J. at 23. Because revocation of staff membership and clinical privileges is defined as an adverse action under Article 9.2–3, plaintiff reasons, the bylaws entitled him to a hearing, and HCMC's failure to provide that hearing constitutes a breach of the bylaws.

The Court concludes that plaintiff's reading of the bylaws is without merit. Section 9.2–3 states that a practitioner is entitled to a hearing upon notice of an "adverse *Board* decision." (Emphasis added.) Plaintiff has pointed to no language supporting his contention that the bylaws entitle a practitioner to a hearing anytime an adverse action occurs. Moreover, plaintiff's reading of section 9.2–3 takes the section out of context; read in conjunction with article 8, section 9.2–3 guarantees a

hearing only when the board takes corrective action. Thus, it does not matter whether HFA or HCMC took the action that terminated plaintiff's staff privileges, because any action HCMC took was not corrective action as it is defined in article 8. Because the bylaws provide for a hearing only when the board takes corrective action, and because plaintiff's staff privileges were not terminated as the result of corrective action, the Hennepin County defendants are entitled to summary judgment on the contract claim.[13]

### B. The HFA Contract

 Plaintiff alleges that HFA breached two clauses of his employment agreement. First, plaintiff alleges that HFA breached section 5.4 of the agreement, which provides that "in the practice of medicine, Employee shall retain independent judgment and responsibility to the extent required by law and medical ethics." Pl.'s Mem., Bloom Aff., Ex. B. Plaintiff asserts that HFA interfered with his independent judgment and responsibility by prohibiting plaintiff from using the special HCMC hematology laboratory, which plaintiff believed was the only laboratory capable of providing him with accurate blood counts; utilizing an impractical and potentially dangerous machine procedure for administering the pheresis treatment; and stopping the tabulation of certain data that plaintiff believed was necessary to properly evaluate his multiple sclerosis patients.[14] Pl.'s Mem., Bloom Aff. ¶ 19.

---

13. The bylaws also provide that "medical staff membership shall also be completely separate and independent of any employment agreements." Pl.'s Mem., Bloom Aff., Ex. H, § 3.2–1. The parties dispute the significance of this provision. Plaintiff argues that it means that his staff privileges exist independent of his relationship with HFA, and therefore continued after HFA terminated him. The Hennepin County defendants argue that the provision does not establish that staff privileges exist independent of the HFA contract, but only gives HCMC authority to revoke the staff privileges of HFA physicians, despite their employment contracts with HFA. Regardless of which interpretation is right, the bylaws guaranteed plaintiff a hearing only if the board took corrective action under article 8. Therefore, the Court need not

address whether staff privileges exist independent of plaintiff's employment contract.

14. In his affidavit, plaintiff also states that HFA stopped the laboratory from carrying out certain tests. Pl.'s Mem., Bloom Aff. ¶ 19. Plaintiff does not specify what tests were involved, and it is not clear from plaintiff's affidavit whether he was prevented from having those tests performed at all, or whether he was merely required to use a different laboratory for the tests. However, the HFA defendants point to deposition testimony in which plaintiff stated that HFA began sending certain samples to the RKDP lab for testing rather than to the HCMC lab (HFA Def.'s Mem., Bloom Dep. at 203) and plaintiff does not dispute this evidence. Therefore, the Court concludes that plaintiff's assertion is that he was not allowed to use the lab of

The HFA defendants argue that section 5.4 did not guarantee plaintiff unlimited staff support or the right to dictate how equipment would be used in treating his patients; rather, it guaranteed only that he would retain the right to make professional treatment decisions in accordance with the dictates of law and medical ethics. They point to deposition testimony in which plaintiff elaborated on the changes in HFA policy that allegedly interfered with his independent judgment and responsibility. In that testimony, plaintiff stated that HFA refused to provide staff to transfer data from laboratory reports to patient flow sheets, so that plaintiff had to either use raw data or transfer the data himself; that HFA required him to use the RKDP laboratory rather than the HCMC laboratory; and that HFA required him to use a pheresis procedure that, while it allowed him to conduct his tests, was inefficient. Def.'s Mem., Bloom Dep. at 200–208, 217–22. These policies, the HFA defendants assert, affect only the procedures by which plaintiff's treatment decisions were to be effected. Absent evidence that plaintiff was prevented from obtaining the tests or administering the therapy he believed appropriate, they argue, the actions he complains cannot be seen as interfering with his judgment and responsibility.

The Court finds that plaintiff has failed to come forth with sufficient evidence to raise a genuine question of fact regarding whether HFA breached section 5.4 of the agreement. The agreement did not guarantee plaintiff the right to exercise his independent judgment on all matters and at all times. Rather, section 5.4 of the agreement specifically subjected plaintiff to the control and supervision of HFA, with the exception that in the practice of medicine, plaintiff was to "retain independent judgment and responsibility to the extent required by law and medical ethics." Pl.'s Mem., Bloom Aff., Ex. B. Thus, plaintiff retained only the degree of independent judgment required by law and ethics.

Plaintiff has failed to argue—much less produce evidence—that law or medical ethics required him to retain control over any of the actions of which he complains.

At best, plaintiff's claim is that HFA made certain aspects of his multiple sclerosis research more difficult. The agreement did not, however, guarantee plaintiff the right to have his data recorded in a particular way or to use the laboratory of his choice. Nor did it guarantee him the most efficient methods of carrying out procedures. While plaintiff's claim that HFA required him to use a machine procedure that was potentially dangerous could, if properly supported, be viewed as an intrusion on his independent judgment, plaintiff has neither produced evidence that he was required by law and medical ethics to dictate the machine procedure nor produced evidence that the procedure was potentially dangerous, beyond his conclusory allegation that it was. In addition, that conclusory allegation conflicts with plaintiff's deposition testimony, in which he stated merely that the procedure was less efficient than the one that he advocated. Def.'s Mem., Bloom Dep. at 222.

Because plaintiff has failed to argue or produce evidence showing that law and medical ethics required him to retain control over the HFA procedures at issue and because plaintiff has failed to point to evidence that he was prevented from carrying out his treatment decisions, the Court concludes that the HFA defendants are entitled to summary judgment on plaintiff's first contract claim.

Plaintiff's second contract claim is that the HFA breached section 7(e) of the employment agreement, which provides that "HFA may terminate this Agreement at any time by giving written notice to Employee at least 60 days prior to the intended termination date." Pl.'s Mem., Bloom Aff., Ex. B. Plaintiff received written notice of termination on April 13, 1989. The notice stated that the termination

his choice, rather than that he was prevented from running certain tests. To the extent plaintiff claims that he was wholly prevented from running certain tests, the Court finds that plain-

tiff has presented insufficient evidence to rebut defendants' showing that he was merely required to use a particular lab for the tests.

would be effective July 1, 1989, and it is undisputed that HFA paid plaintiff his salary until that date. However, the notice also relieved plaintiff of his duties and responsibilities immediately, ordering him to cease treating and examining HFA patients. Pl.'s Mem., Bloom Aff., Ex. C.

The HFA defendants argue that the employment agreement does not confer a right to perform specific duties and that by paying plaintiff for sixty days after he received notice of termination, they complied fully with the agreement. The HFA defendants point out that plaintiff testified in his deposition that HFA had never promised him that he would perform a particular job, that his duties had changed from time to time during his five years with HFA, and that his supervisor had the authority to change his work assignments. Def.'s Mem., Bloom Dep. at 164–65. The right to assign plaintiff different duties, they argue, necessarily includes the right to assign him no duties at all.

In response, plaintiff argues that the plain language of section 7(e) states that the agreement was to remain in effect for sixty days following written notice of termination. The agreement includes not only HFA's obligation to pay plaintiff, but HFA's obligation under section 5.4 to allow plaintiff to exercise his independent judgment and responsibility. By barring plaintiff from HFA and HCMC facilities immediately, plaintiff argues, the HFA defendants deprived him of his contractual right to continue making professional decisions about his existing patients for sixty days after receiving notice of termination.

As the HFA defendants note, the general rule is that "[a] principal does not, by contracting to employ an agent, thereby promise to provide him with an opportunity for work...." *Restatement (Second) of Agency* § 433 (1958). Rather, absent evidence of a promise to provide an opportunity to work, a contract to employ represents only a promise to pay compensation during the contract period. *Id.* cmt a. The Court concludes that plaintiff has not pointed to evidence of a promise to provide an opportunity to work. Section 5.4 of the agree-ment provides only that plaintiff was to "retain independent judgment and responsibility to the extent required by law and medical ethics." Pl.'s Mem., Bloom Aff., Ex. B. It does not guarantee plaintiff an opportunity to treat certain patients. Indeed, section 5.4 also provides that plaintiff was to be "subject to the control and supervision of HFA and the policies of HFA," *id.*, and plaintiff himself testified that HFA had exercised that control periodically to alter his duties throughout his tenure at HFA. HFA's argument that the right to assign and alter plaintiff's duties includes the right to remove those duties in their entirety is a persuasive one. Therefore, the Court will grant summary judgment for the HFA defendants on plaintiff's second contract claim.

### III. *The Civil Rights Claims*

█ It is undisputed that plaintiff lost his staff privileges when HFA terminated him, and that HCMC did not provide plaintiff with a hearing regarding the privileges. Plaintiff asserts that by revoking his HCMC medical staff privileges without a hearing, the Hennepin County defendants and the HFA defendants have deprived him of due process, in violation of 42 U.S.C. § 1983.

In order for plaintiff to prevail on his civil rights claims, he must point to a property interest entitled to due process protection. Property interests do not derive from the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). In addition to being defined by state law, property interests may be created by contract. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (a property interest in employment may be created by contract); *Jago v. Van Curen*, 454 U.S. 14, 18, 102

S.Ct. 31, 34, 70 L.Ed.2d 13 (1981) (principles of contract law serve as useful guides in determining whether constitutionally protected property interests exist).

To claim a protected property interest in a given benefit, a person must have a legitimate claim of entitlement to it; a need or desire for the benefit will not suffice, nor will a unilateral expectation of receiving the benefit. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Thus, the Supreme Court has held that where a person claims a property interest in employment, he must point to some source, such an employment contract allowing dismissal only for just cause, that entitles him to continued employment. *Id.* at 578, 92 S.Ct. at 2709.

The parties agree that in order to determine whether plaintiff had a constitutionally protected property interest in his medical staff privileges, the Court must consider the contractual relationship out of which those privileges arose. They dispute, however, which contracts define plaintiff's interest. Defendants base their arguments primarily on plaintiff's employment contract with HFA. Plaintiff's contract with HFA allows HFA to terminate the contract without cause upon sixty days written notice. Pl.'s Mem., Bloom Aff., Ex. B, § 7(e). It also requires plaintiff to comply with all terms of the agreement between HCMC and HFA. *Id.* § 5.3. The contract between HCMC and HFA provides that only HFA physicians may attend patients at HCMC. Am.Compl., Ex. C., Art. I. Moreover, plaintiff testified that "common knowledge was that you had to be HFA" in order to attend patients at HCMC. Henn. Cty. Def.'s Mem., Bloom Dep. at 250. Thus, defendants argue, plaintiff has no legitimate claim of entitlement to continued staff privileges at HCMC and no property right deserving of due process protection.

Plaintiff argues that the HCMC bylaws, not his employment contract with HFA, define his due process rights. However, rather than explaining how the bylaws give rise to a property interest, plaintiff builds his case on two assertions. First, he asserts that it is beyond question that a physician's medical staff privileges constitute an interest protected by the Fourteenth Amendment. Second, he asserts that where medical staff bylaws require procedural due process before staff privileges can be terminated, the bylaws themselves sustain a claim to a protected property interest. Plaintiff then goes on to argue that the bylaws entitled him to notice and hearing under the facts of this case.

Neither of plaintiff's initial assertions withstands scrutiny. To support his assertion that staff privileges constitute a protected interest, plaintiff cites *Klinge v. Lutheran Charities Ass'n of St. Louis*, 523 F.2d 56 (8th Cir.1975); *Shaw v. Hospital Authority of Cobb Cty*, 507 F.2d 625 (5th Cir.1975), *aff'd on reh'g*, 614 F.2d 946 (5th Cir.1980); and *Chiaffitelli v. Dettmer Hospital, Inc.*, 437 F.2d 429 (6th Cir.1971). None of these cases, however, hold that staff privileges are in all cases protected property interests. In *Klinge*, the parties conceded that the plaintiff had a protected interest. In *Shaw*, the court held that a hospital's arbitrary refusal to grant staff privileges to podiatrists implicated an individual podiatrist's liberty interest in engaging in his selected occupation. Finally, *Chiaffitelli* was decided before the Supreme Court decided *Roth*, and the court therefore did not apply the *Roth* analysis.

Plaintiff's assertion that a protected property interest necessarily arises when hospital bylaws provide for hearings is similarly unsupported. Plaintiff bases his assertion on *Northeast Georgia Radiological Assoc. v. Tidwell*, 670 F.2d 507 (5th Cir. 1982). The plaintiffs in *Tidwell* were a doctor with staff privileges at a public hospital and the doctor's wholly-owned professional corporation. The plaintiffs entered into an exclusive contract to provide the hospital with radiology services. The contract, which could be terminated only for cause, required that all corporation employees be hospital staff members and provided that the staff privileges of the corporation's employees would be withdrawn if the contract were terminated. The contract also provided that all matters not covered in the contract were to be governed by the hospital's bylaws and policies.

The hospital terminated the contract, and with it, the doctor's staff privileges. The doctor requested, but did not receive, a hearing pursuant to the hospital bylaws. The doctor and the corporation then brought suit alleging breach of contract and deprivation of due process. The trial court granted summary judgment for the defendant. The United States Court of Appeals for the Fifth Circuit reversed, holding that the doctor had a property interest in his medical privileges that could not be deprived without due process.

In reaching this result, the court looked to the contract between the plaintiffs and the hospital. The court determined that because the contract incorporated the bylaws, and because the bylaws detailed the procedure to be followed when corrective action against a physician was warranted, the understanding that the doctor's staff privileges would not be terminated without procedural due process was part of the contract between the doctor and the hospital. Thus, the court concluded, the contract and the bylaws themselves established the existence of rules or mutual understandings that sustained the plaintiffs' claim to a protected property interest. *Id.* at 511.

Contrary to plaintiff's assertion, the *Tidwell* court did not hold that a protected property interest arose whenever medical staff bylaws provided for pre-termination hearings; rather, the *Tidwell* court looked at both the contract and the bylaws to determine whether the plaintiffs had a protected property interest arising from the understandings of the parties. In the instant case, the Court agrees with the defendants that the understandings of the parties included not only the HCMC bylaws but also the contract between HFA and plaintiff.

As discussed above, the bylaws provide that a practitioner is entitled to notice and hearing when the board takes an adverse action under article 8; the definition of adverse recommendation or action includes revocation of staff membership or clinical privileges. Pl.'s Mem., Bloom Aff., Ex. H, Art. 9. However, plaintiff's relationship with HCMC was not created and defined exclusively by the bylaws; his employment contract with HFA also affected that relationship. As defendants note, the employment contract provided that plaintiff's employment could be terminated without cause upon sixty days notice and required plaintiff to abide by the terms of the HFA/HCMC contract. Plaintiff knew that HFA provided services to HCMC pursuant to the contract and that a physician had to be affiliated with HFA in order to attend patients at HCMC. Thus, the understandings of the parties included two ways in which plaintiff could lose staff privileges without adverse board action and without the concomitant right to hearing: HFA could lose the HCMC contract to another physician group, or HFA could terminate plaintiff's employment. Given these possibilities, plaintiff's interest in his staff privileges was merely a unilateral expectation that they would continue, not a legitimate claim of entitlement giving rise to a protected property interest under *Roth*. Therefore, the Court will grant summary judgment for the defendants on the civil rights claims.[15]

## IV. *Misappropriation of Trade Secret*

■ Plaintiff alleges that defendants Shapiro, Davidman, and Collins engaged in a scheme to obtain his multiple sclerosis protocol by telling plaintiff that a copy had to be submitted immediately to HCMC's Institutional Review Board (IRB), which monitors research on human subjects. Plaintiff alleges that the IRB had not in fact requested that the protocol be submitted immediately and that when plaintiff provided a copy of his protocol to Davidman's secretary for typing, Davidman surreptitiously obtained a copy from the secretary without plaintiff's knowledge. After plaintiff was discharged, HFA continued to

---

**15.** Both the Hennepin County defendants and the HFA defendants argue that they cannot be held liable under 42 U.S.C. § 1983, because there was no state action involved in plaintiff's termination. Because the Court has concluded that plaintiff had no protected property interest in his staff privileges, it does not reach this issue.

use the protocol in modified form to treat plaintiff's former patients. Plaintiff alleges that the conduct of defendants Shapiro, Davidman, and Collins constitutes misappropriation of a trade secret under Minn. Stat. § 325C.01.

The defendants argue that even if the protocol is a trade secret and even if the defendants misappropriated it, they cannot be held liable, because HFA and RKDP possess a shop right in the protocol. Moreover, the defendants assert, and plaintiff does not dispute, that HFA used the protocol only to treat plaintiff's multiple sclerosis patients after he left HFA and that plaintiff consented to that use of the protocol. HFA Def.'s Mem., Beukema Aff., Ex. 8; Davidman Aff. ¶ 10; Pl.'s Mem., Bloom Aff. ¶ 10, 26.

The shop right doctrine is an equitable doctrine of patent law holding that "where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 188, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933). The shop right doctrine confers upon an employer an implied, nonexclusive, royalty-free license to use an employee's invention. *Wommack v. Durham Pecan Co.*, 715 F.2d 962, 965 (5th Cir.1983). The HFA defendants assert that although the shop right doctrine is a creature of patent law, there is no rationale limiting it to patent cases, and note that the doctrine has been invoked in cases involving trade secrets. *See, e.g., Lariscey v. United States*, 949 F.2d 1137 (Fed.Cir.1991); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1259–60 (3d Cir. 1985); *Toner v. Sobelman*, 86 F.Supp. 369, 377 (E.D.Pa.1949).

Whether the shop right doctrine extends to trade secrets, however, is a matter of state law. 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 5.02[4][c] (1991). Minnesota has adopted the Uniform Trade Secrets Act, which protects certain types of information by providing an action for misappropriation; the Act defines as misappro-

priation not only the use of a trade secret, but the acquisition of it as well. Minn.Stat. § 325C.01(3); *Electro–Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn.1983). The defendants have cited, and the Court has located, no case in which the shop rights doctrine has been applied under the Uniform Trade Secrets Act; cases in which the doctrine has been applied to trade secrets were decided under the common law of trade secrets, not under the statute.

Moreover, even if Minnesota would apply the shop right doctrine to cases brought under the Uniform Trade Secrets Act, the doctrine is inapplicable to the case at hand. The shop right doctrine allows an employer to use an employee's invention under certain circumstances. In the instant case, however, plaintiff has alleged that defendants Davidman, Collins, and Shapiro misappropriated his trade secret not by using the protocol, but by improperly acquiring it. Thus, even if the shop right doctrine were incorporated into Minnesota law, it would not shield the defendants from liability under Minn.Stat. § 325C.01(3)(i), which prohibits "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Because the defendants have pointed to no indication that Minnesota recognizes the shop doctrine in cases brought under the Uniform Trade Secrets Act, and because the doctrine would not shield the defendants from liability in this case in any event, the defendants are not entitled to summary judgment on the issue of whether they misappropriated a trade secret.

## V. *Conversion*

█ Plaintiff alleges that by obtaining and modifying his multiple sclerosis protocol, defendants Davidman, Collins, and Shapiro unlawfully converted the protocol for their own use. The HFA defendants argue that the conversion claim must be dismissed for two reasons: first, they argue that only tangible personal property can be the subject of conversion; second, they argue that even if the protocol could be subject to conversion, the substantial and ex-

tended interference with plaintiff's rights necessary to establish conversion is lacking. In response, plaintiff argues that intangible property may be the subject of conversion if it is merged in or identified with some document and that the HFA defendants exercised complete dominion over the protocol by modifying it, by removing plaintiff's name from it, and by submitting the modified version to the IRB with another doctor's name on it.

Under Minnesota law, conversion is defined as "an act of willful interference with the personal property of another which is without justification or which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property." *Dain Bosworth, Inc. v. Goetze,* 374 N.W.2d 467, 471 (Minn.Ct.App.1985) (citing *Larson v. Archer–Daniels–Midland Co.,* 32 N.W.2d 649, 650 (Minn.1948)). Minnesota courts have not defined the parameters of "personal property." The Eighth Circuit, however, considered the issue in *H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531 (8th Cir.1989).

The *H.J., Inc.* plaintiff was a farm equipment distributor who claimed that the defendant manufacturer converted the plaintiff's network of dealers to its own use by eliminating its distributors and selling directly to the dealers. A jury found that the plaintiff had a property interest in the dealer network that the defendant wrongfully converted. On appeal, the defendant argued that, as a matter of law, the plaintiff did not have a property interest that was subject to conversion. The Eighth Circuit agreed.

In reaching this result, the court applied the general rule that conversion applies only to tangible property or intangible property that is merged in, or identified with, some document. *Id.* at 1547 (citing *Prosser and Keeton on Torts* at 91–92 (1984); Restatement (Second) of Torts §§ 222A, 242 (1965)). The court noted that the plaintiff's claimed property interest was not evidenced by any document and that its conversion claim was more properly an allegation that the defendant "stole" its good relations with the dealers. The court

concluded that Minnesota courts would not expand the tort of conversion to protect an intangible interest in the plaintiff's business relationship with a group of dealers. *H.J., Inc.,* 867 F.2d at 1531.

Plaintiff reads *H.J., Inc.* to hold that whenever an interest is evidenced by a document, the tort of conversion applies; because plaintiff's multiple sclerosis protocol was reduced to a document, plaintiff argues, he may invoke the tort of conversion to protect it. Defendants read *H.J., Inc.* to hold that only tangible personal property may be the subject of conversion; because plaintiff's property interest in his protocol is intangible, they argue, the tort of conversion is inapplicable.

In the Court's view, *H.J., Inc.* holds neither that conversion is limited to tangible property nor that conversion applies whenever an intangible interest is reduced to a document; rather, *H.J., Inc.* merely holds that Minnesota courts would likely follow the tradition rule limiting the tort of conversion to certain types of intangible interests. Under that rule, conversion may apply to three situations involving intangible property. The first is the conversion of documents in which intangible rights are merged (such as promissory notes, bank checks, bonds, and bills of lading). The second is the conversion of tangible objects which are highly important to the exercise of an intangible right (such as bank savings books, insurance policies, tax receipts, and account books). The third is the conversion of rights without an accompanying conversion of something tangible (for example, a corporation's refusal to register a transfer of shareholder rights). *Prosser & Keeton, supra* at 91.

In each of these situations, the tort of conversion is applied to protect "the kind of intangible rights which are customarily merged in or identified with some document." *Id.* at 92. The documents subject to conversion under the traditional rule are documents that confer intangible rights: bills of lading confer the right to take possession of property, promissory notes confer the right to payment, bank savings books confer the right to withdraw funds.

Because the document confers the intangible right, conversion of the document is deemed the conversion of the right. However, the document that plaintiff claims has been converted—his multiple sclerosis protocol—confers no rights; plaintiff's interest in the protocol arises not from the document, but from the law of intellectual property.

Because plaintiff's rights in the protocol are not the type of rights customarily merged in a document and are therefore not the type of intangible rights traditionally subject to conversion, protecting them through the tort of conversion would require an extension of Minnesota law. Theoretically, the tort of conversion could be broadened to apply to any interference with a property interest, whether tangible or intangible. The *H.J., Inc.* court rejected such an expansion, thus following the recommendation of Prosser and Keeton, who advocate other means, such as unfair competition laws, to protect against the unfair use and appropriation of intangible interests. *Prosser & Keeton, supra* at 92.

The *H.J., Inc.* court's reluctance to expand the Minnesota law of conversion guides the Court's decision in this case. There is no indication in Minnesota case law that Minnesota courts would adopt such an expansive view of the tort. Moreover, Minnesota law offers protection of intangible interests such as plaintiff's through the Uniform Trade Secrets Act and the law of unfair competition. Because Minnesota has not extended the tort of conversion to protect the property interest plaintiff asserts, the Court will grant summary judgment for the HFA defendants on the conversion claim.

■ Alternatively, the HFA defendants are entitled to summary judgment on the conversion claim on the grounds that their actions did not constitute substantial interference with plaintiff's right to possession. The tort of conversion applies where the interference with the plaintiff's property is so serious as to justify the forced judicial sale of the property to the defendant. *Prosser & Keeton, supra,* at 90. Because the purpose of the conversion action is to force title on the defendant and make him pay for the full value of the property, conversion is typically limited to instances where the plaintiff has been completely and permanently deprived of his property. 9 *Dunnell Minnesota Digest,* Conversion § 1.03(a) (4th ed. 1990) (citing *Dow Arneson Co. v. City of St. Paul,* 191 Minn. 28, 253 N.W. 6 (1934)). Thus, Minnesota courts have held that "[t]o constitute conversion, one must exercise dominion over property that is inconsistent with the owner's right to the property, or some act must be done that destroys or changes the character of the property or deprives the owner of possession permanently or for an indefinite length of time." *McKinley v. Flaherty,* 390 N.W.2d 30, 32 (Minn.Ct.App.1986) (citing *Hildegarde, Inc. v. Wright,* 244 Minn. 410, 70 N.W.2d 257, 259 (1955)).

In the instant case, the HFA defendants allegedly made a copy of plaintiff's protocol, modified it, placed another doctor's name on it, and used it to treat selected patients. Plaintiff argues that this constitutes complete dominion over his property. Plaintiff has not, however, been deprived of possession of his protocol. The original protocol still exists and there is no allegation that the HFA defendants deprived plaintiff of it; thus, the HFA defendants' actions do not prevent plaintiff from continuing to use his protocol as he sees fit. While the HFA defendants' actions may constitute some interference with plaintiff's property interest in his protocol, they do not constitute such a substantial interference with the possession of his property that the defendants should be forced to pay plaintiff its full value. Therefore, the Court concludes that even if the tort of conversion were extended to apply to plaintiff's interest in the protocol, the HFA defendants would be entitled to summary judgment on the conversion claim.

## VI. *Fraud*

■ Plaintiff alleges that defendants Collins and Davidman acted fraudulently in obtaining plaintiff's protocol. The elements of fraudulent misrepresentation under Minnesota law are:

1. there must be a misrepresentation;
2. the representation must be false;
3. it must relate to a past or present fact;
4. the fact must be material;
5. the fact must be susceptible of knowledge;
6. the representor must know that the fact is false or assert it as of his own knowledge;
7. the representor must intend to have the other person induced to act or justified in acting upon the fact;
8. the person must be induced to act or justified in acting upon the fact;
9. the person's actions must be in reliance upon the representation;
10. the person must suffer damage;
11. the misrepresentation must be the proximate cause of the injury.

*Southern Minnesota Municipal Power v. St. Peter,* 433 N.W.2d 463, 469 (Minn.Ct. App.1988); *Spitzmueller v. Burlington Northern R. Co.,* 740 F.Supp. 671, 676 (D.Minn.1990).

The parties disagree on what statement plaintiff alleges was fraudulent. The HFA defendants assert that plaintiff's complaint alleges that Davidman and Shapiro falsely told him that his protocol had to be submitted to the IRB; the defendants argue that because the statement that the protocol had to be submitted to the IRB was true, plaintiff cannot sustain a fraud claim. Plaintiff asserts that the fraudulent statement was not that the protocol had to be submitted to the IRB, but that the IRB had requested that it be submitted on February 13, 1989. Rather than address whether this statement was true, the HFA defendants argue that plaintiff has, in his memorandum, attempted to introduce a fraudulent statement that was not pled with the particularity required by Federal Rule of Civil Procedure 9(b). The defendants further argue that in any event, plaintiff cannot prevail on his fraud claim because he cannot establish the essential element of reliance.

The Court concludes that it need not reach the Rule 9(b) issue, because plaintiff has not set forth facts showing that he relied on the alleged misrepresentation. In his affidavit, plaintiff asserts that Davidman, Shapiro, and Collins told him that the IRB chairman had requested that the protocol be submitted immediately and that because they were his supervisors and had superior knowledge of the IRB's requirements, he trusted and relied upon their representations. Pl.'s Mem., Bloom Aff. ¶ 9. In his deposition, however, plaintiff testified that he did not believe that the protocol had to be submitted to the IRB and that he consulted his attorney regarding the issue. HFA Def.'s Mem., Bloom Dep. at 142. On February 16, 1989, plaintiff's attorney wrote a letter to the IRB chairman stating that his research revealed that submission of the protocol was not required. HFA Def.'s Mem., Beukema Aff., Ex. 6. Plaintiff testified that he agreed with his attorney's position. HFA Def.'s Mem., Bloom Dep. at 145.

Affidavit testimony may not be used to avoid summary judgment by raising sham issues for trial; where conflicts between depositions and affidavits raise only sham issues, those conflicts do not present genuine issues of fact precluding summary judgment. *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1366 (8th Cir.1983). Plaintiff's affidavit testimony that he gave the protocol to the defendants because he trusted and relied on their representations is flatly contradicted by plaintiff's deposition testimony. The affidavit testimony is also contradicted by the February 16 letter of plaintiff's attorney, which is contemporaneous documentary evidence that plaintiff consulted his attorney when the defendants requested the protocol, that his attorney advised him that he need not submit it, and that his attorney told defendants that submission was not necessary. Under these facts, it seems clear that whatever prompted plaintiff to give the defendants his protocol, it was not their representations that the IRB had requested its immediate submission. Because plaintiff has not established that there is a genuine issue of fact regarding whether he relied on the defendants' representations, the Court will grant summary

judgment for the HFA defendants on the fraud claim.

## VII. *Wrongful Interference*

■ Plaintiff alleges that by terminating his employment, HFA, Davidman, and Shapiro wrongfully interfered with his business relations with HCMC and his patients.[16] To prevail on a claim of intentional interference with business relations, the plaintiff must prove:

1. the existence of a contract;

2. the alleged wrongdoer's knowledge of the contract;

3. his intentional procurement of its breach;

4. without justification; and

5. damages resulting therefrom.

*Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn.1982) (citations omitted). Interference is justified if it is reasonable under all the circumstances. *Schumacher v. Ihrke*, 469 N.W.2d 329, 332 (Minn.Ct.App.1991).

The HFA defendants point out that while plaintiff was employed by HFA, he received compensation for patient care and research only from HFA (HFA Def.'s Mem., Beukema Aff., Ex. 7) and that his contract with HFA provided that all money plaintiff derived from treating patients at HCMC or from other professional activities were the property of HFA. Pl.'s Mem., Bloom Aff., Ex. B, § 4.1. Thus, they argue, the only business relations plaintiff ever had with HCMC or his patients were through his employment with HFA, and any expectation that those relations would continue was dependent on the continuation of his employment. The HFA defendants argue that the relations with which the defendants are alleged to have interfered by terminating plaintiff's employment are the very fruits of that employment, and that therefore, plaintiff is in effect claiming that the HFA defendants interfered with their own contract. Under Minnesota law, however, a party cannot wrongfully interfere with its own contract. *Bouten*, 321 N.W.2d at 901; *Hough Transit, Ltd v. National Farmers Organization*, 472 N.W.2d 358, 361 (Minn.Ct.App.1991). The HFA defendants thus urge that they are entitled to summary judgment on the wrongful interference claim.

In response, plaintiff argues that because he had staff privileges at HCMC before HFA was formed in 1984, he possessed a contractual right to the staff privileges that was independent of his employment contract, and that the HFA defendants were aware of this contractual right. By terminating plaintiff's employment contract, he asserts, the HFA defendants intentionally interfered with his contract with HCMC or procured its breach by causing the termination of his privileges.

The Court finds that plaintiff has not set forth facts to support his claim that the HFA defendants wrongfully interfered with his relationship with HCMC or his patients. The Court is persuaded by the HFA defendants' argument that any business relationship plaintiff had with HCMC and his patients arose from and was controlled by his contract with HFA. While it is undisputed that plaintiff had medical staff privileges at HCMC before HFA was formed and before HFA and HCMC entered into their exclusive contract, it is also undisputed that plaintiff's employment contract required him to abide by the terms of the HFA/HCMC contract and that plaintiff was aware that he had to be affiliated with HFA in order to attend patients at HCMC. Thus, whatever his relationship with HCMC was prior to 1984, that relationship changed when he became an employee of HFA. Because plaintiff's relationship with HCMC and his patients arose from and was controlled by his contract with HFA, the Court agrees with the defendants that

---

**16.** Count 12 of plaintiff's amended complaint also asserts that by terminating his staff privileges, the Hennepin County defendants wrongfully interfered with his business relations with his patients. Neither the Hennepin County defendants nor plaintiff have addressed this issue in their memoranda. However, because the Hennepin County defendants have moved for summary judgment on all counts of the complaint and because plaintiff has not opposed their motion as to Count 12, the Court will grant summary judgment for the Hennepin County defendants on the wrongful interference claim.

plaintiff's claim amounts to an allegation that the HFA defendants interfered with their own contract. Such a claim is not actionable under Minnesota law.

■ Even assuming that HFA's actions in terminating plaintiff interfered with plaintiff's relationship with HCMC and his patients, the defendants would be entitled to summary judgment on the wrongful interference claim, because the HFA defendants' action was not without justification. In terminating plaintiff's employment, the HFA defendants merely exercised their contractual right to terminate the employment agreement without cause upon sixty days notice. Because HFA had an exclusive contract to provide services at HCMC, one consequence of that action was that the plaintiff lost his staff privileges at HCMC. To hold the HFA defendants liable for that consequence under the tort of wrongful interference would be to hold that the defendants could not exercise their contractual right to terminate plaintiff's employment without cause.

Because plaintiff's claim amounts to an allegation that the HFA defendants interfered with their employment contract with plaintiff and because in any event the HFA defendants' action was not without justification, the HFA defendants are entitled to summary judgment on the wrongful interference claim.

## VIII. *Breach of Fiduciary Duty*

■ Plaintiff alleges that by terminating his staff privileges, the Hennepin County defendants breached a fiduciary duty owed to patients, taxpayers, and the public. The Hennepin County defendants concede that they owe a fiduciary duty to patients, taxpayers, and the public; they argue, however, that they had no duty to act for plaintiff's benefit while subordinating the interests of the county and the public. The Hennepin County defendants assert that by entering into and honoring the exclusive contract with HFA, they fulfilled their fiduciary duty to the public. The contract provides that in exchange for the exclusive right to attend paying patients at HFA, HFA physicians will provide free care to

the indigent patients admitted by HCMC and that they will also provide administrative, research, and teaching services. Thus, the Hennepin County defendants assert, the exclusive contract arrangement ensured that all HCMC patients, solvent or insolvent, would receive medical care, that medical student and resident training programs would continue, and that medical services would be professionally administered. They argue that allowing plaintiff to retain medical privileges in breach of the exclusive provider agreement would have jeopardized the community and patient benefits derived from the agreement and would itself have been a breach of their fiduciary duty.

In response, plaintiff points to two New Jersey cases in which courts required medical organizations to use their power to admit doctors as a fiduciary power to be exercised for the advancement of the public interest. *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 170 A.2d 791 (1961); *Greisman v. Newcomb Hospital*, 40 N.J. 389, 192 A.2d 817 (1963). In *Falcone*, the defendant was a medical society that denied membership to the plaintiff, a duly registered and licensed physician, because he had not attended a medical school that had been approved by the American Medical Society (AMA). In *Greisman*, the defendant was a public hospital that would not accept an application for membership by the plaintiff, also a duly registered and licensed physician, on the same grounds. In both cases, the New Jersey Supreme Court noted that the defendant had monopolistic power to admit or exclude doctors: in *Falcone*, the plaintiff could not acquire staff privileges at county hospitals without membership in the medical society, and in *Greisman*, the defendant was the only hospital in the plaintiff's practice area. In both cases, the court held that the defendants' monopolistic power had to be exercised not for private ends, but for the benefit of the public; thus, they deemed the power to pass on membership applications a power that was fiduciary in nature. Denying membership to qualified doctors merely because they had not attended

AMA-approved schools was held to be an abuse of that fiduciary power.

Plaintiff maintains that *Falcone* and *Greisman* establish that a physician has standing to sue when a public hospital breaches a fiduciary duty owed to its patients. He asserts that when HCMC terminated his staff privileges, his patients were unable to receive treatment from him. Pl.'s Mem., Korby Aff. ¶ 8, Olssen Aff. ¶ 11, 12. By denying the patients treatment by the nephrologist of their choice, plaintiff argues, the Hennepin County defendants breached a fiduciary duty owed to those patients and to the public, and under *Falcone* and *Greisman* he may sue to enforce that fiduciary duty.

However, *Falcone* and *Greisman* do not support plaintiff's claim, for two reasons. First, there is no indication that Minnesota would adopt New Jersey's law regarding the fiduciary duty of public hospitals. Second, the facts of the instant case differ significantly from those of the New Jersey cases. In *Falcone* and *Greisman,* the plaintiffs were arbitrarily denied membership in medical organizations on grounds that the New Jersey Supreme Court deemed unrelated to sound hospital standards and not in furtherance of the public interest. *Greisman,* 192 A.2d at 825. Moreover, the institutions denying the plaintiffs membership possessed monopolistic power to preclude the plaintiffs from maintaining hospital practices. Thus, the court held that the defendants were abusing a fiduciary power owed to the public.

In the instant case, there is no allegation that HCMC possesses a monopolistic power to preclude plaintiff from practicing medicine. Moreover, HCMC has not refused plaintiff membership on the basis of an arbitrary criteria; instead, it has honored an exclusive contract which it was statutorily authorized to enter into and which serves the public interest. Finally, the New Jersey cases do not support plaintiff's assertion that a public hospital has a fiduciary duty to provide individual patients with the doctor of their choice; the cases merely hold that medical organizations must not set up arbitrary rules that preclude physicians from practicing their profession. Because plaintiff has not pointed to legal authority supporting his claim that the Hennepin County defendants breached a fiduciary duty by terminating his privileges, the Court will grant summary judgment for the Hennepin County defendants on the fiduciary duty claim.

## IX. *The Conspiracy Claim*

Count 14 of plaintiff's complaint alleges that the Hennepin County defendants, together with the HFA defendants, conspired to terminate plaintiff's privileges and that the defendants acted in concert to deprive plaintiff of his patients, his right to practice nephrology and conduct research, and his interests in his protocol.[17] Am. Compl. ¶ 131. Plaintiff asserts that this conspiracy renders all the defendants individually and severally liable for all of his injuries. *Id.* ¶ 134. The HFA defendants argue that plaintiff's conspiracy claim should be dismissed as mere surplusage, because it adds nothing to the substantive claims alleged in the other counts of the complaint. They also argue that plaintiff's claim is an impermissible attempt to collect allegations that run against different parties and impose liability on each defendant for the acts of the others. The Hennepin County defendants argue that plaintiff has

---

17. In his brief, plaintiff appears to argue that his conspiracy claim rests on the existence of two conspiracies. Pl.'s Mem. in Opp. to the HFA Def.'s Mot. for Summ. J. on Non–Antitrust Claims at 38. First, he asserts that HFA conspired with the HCMC to allocate the ESRD market and to deprive plaintiff of his medical staff privileges. The Court has found, however, that plaintiff has not produced evidence of an HFA/HCMC conspiracy and that neither party acted unlawfully with respect to the termination of plaintiff's privileges. Thus, there is no unlawful act on which plaintiff could rest this conspiracy claim.

Second, he asserts that defendants Shapiro, Collins, and Davidman engaged in a concerted effort to deprive him of his protocol. Plaintiff did not, however, allege the existence of this conspiracy in his complaint; rather, he alleged that all the defendants acted together to cause him harm. Plaintiff may not use his summary judgment papers to add theories not pled in his complaint.

produced no evidence of an element essential to his conspiracy claim: the existence of an agreement between the Hennepin County defendants and the HFA defendants to harm plaintiff.

Under Minnesota law, a conspiracy is a combination of persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Liability for damages arising from a civil conspiracy is predicated upon the wrong done to the plaintiff, and not upon the conspiracy or combination itself. *Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, 41 N.W.2d 818, 824 (1950). Therefore, the Minnesota Supreme Court has noted that, "[a]ccurately speaking, there is no such thing as a civil action for conspiracy"; allegations of conspiracy neither change the nature of a cause of action nor add to its legal force. *Id.* at 825. Rather, a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability. *Id.*

 Minnesota law places limits on the extent to which a civil conspiracy theory may be used to impose vicarious or joint and several liability. A plaintiff may not use allegations of conspiracy to weld into a single claim actions based upon contract and tort or actions running against different defendants. *Jewell v. Jewell*, 215 Minn. 190, 9 N.W.2d 513, 516–17 (1943). A conspiracy claim may stand only if it constitutes a single cause of action that is "against and affect[s] all defendants alike." *Id.* 9 N.W.2d at 516. Thus, the *Jewell* court held that a plaintiff could not bring together under a claim of conspiracy causes of action that did not involve all the parties to the action.

In the instant case, plaintiff invokes the theory of civil conspiracy to bring together all his claims and render each defendant liable for the acts of the other. Each of plaintiff's claims, however, does not run against all of the defendants; indeed, the only claims in which all the defendants are implicated are the antitrust claims, which the Court has determined are unfounded. Thus, his conspiracy claim is untenable under *Jewell*. Moreover, even if plaintiff were allowed to gather his claims under the conspiracy umbrella, he has failed to produce evidence that defendants' acts were motivated by community of purpose or a common understanding to commit wrong. Such evidence is essential to a civil conspiracy claim. 7 *Dunnell Minnesota Digest*, Conspiracy § 3.01 (4th ed. 1990). The Court therefore finds that the HFA defendants and the Hennepin County defendants are entitled to summary judgment on the conspiracy claim.

Accordingly, based upon the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that

1. The Hennepin County defendants' motion for summary judgment is granted in its entirety;

2. The HFA defendants' motion for summary judgment on the misappropriation claim is denied;

3. The HFA defendants' motion for summary judgment on all other claims is granted.